UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Michael Boyer, et al.,

Plaintiffs

v.

Allstate Indemnity Company,

Defendant

Case No. 3:12 cv 1136

MEMORANDUM OPINION

## I. INTRODUCTION

Michael and Roxanne Boyer lived at 24774 State Route 51 West, Millbury, Ohio. After purchasing the property in 1994, the Boyers secured fire and insurance coverage. On April 5, 2011, a fire severely damaged the Boyers' property. At the time of the fire, they had coverage of up to $100,000.00 for their residence from September 24, 2010 through September 24, 2011, through Allstate Indemnity Company[1].

In July 2011, the Boyers submitted a proof of loss claim to Allstate for the damage to their property. In January 2012, Allstate denied the claim under its concealment or fraud exclusion of the insurance policy.

On April 5, 2012, Michael and Roxanne Boyer filed the current action in the Common Pleas Court of Ottawa County against Allstate Indemnity Company. Their claims include (1) request for a declaratory judgment that Plaintiffs are entitled to payment for their loss; (2) breach of contract; (3)

---

1 At the time of the fire, the Boyers had in place Allstate's Deluxe Select Value Homeowners Policy No. 9 26 306070 09/24.

bad faith; (4) bad faith, breach of fiduciary duties; and (5) a claim for punitive damages. Defendant Allstate removed the case from state court to this Court on May 8, 2012.

This matter comes before me on the Defendant's motion for summary judgment ( Doc. No. 42), the respective Plaintiffs' replies (Doc. Nos. 59 and 70), and Defendant's response (Doc. No. 75). This Court has jurisdiction pursuant to 28 U.S.C. § 1332. For the reasons that follow, the Defendant's motion is granted in part and denied in part.

## II. Factual Background

### A. The Fire

On the morning of April 4, 2011, the entire Boyer family was at home. Michael Boyer saw his teenage children, Matthew and Amanda, off to school. Michael's wife, Roxanne Boyer, was in an upstairs bedroom asleep. After seeing his children leave, Michael returned to sleep on the couch on the first floor.

Michael awoke to hear Roxanne screaming and ran up the stairs. However, as the only point of entry to Roxanne's room, a craft room, was on fire, Michael was unable to reach her. He then went outside of the house, retrieved a ladder and assisted her down from her bedroom window. At that time, a passerby observed smoke and called 911. Shortly thereafter, the fire department arrived to extinguish the blaze.

### B. The Claims Process

The fire was reported to Allstate, who promptly hired Sadler & Associates to conduct an investigation to determine the origin and cause of the fire. The assigned investigator, Eric Mason, began with an on-site investigation on April 6, 2011. Mason returned to the scene on April 8, 2011, with an electrical engineer to complete on-site investigation. Sadler & Associates were also authorized by Allstate to conduct an examination of the electrical equipment in the residence.

As part of his investigation, Mason interviewed all members of the Boyer family. Through those interviews, Roxanne Boyer was identified as the only known smoker in the home. Matthew Boyer told Mason he was not a smoker as did his sister Amanda Boyer. Both children confirmed that Roxanne was the only smoker in the house.

In his first interview with Mason, Michael Boyer stated there were no electrical problems in the home. In confirming that Roxanne smoked, he opined that she may have dropped ash from a cigarette. In Roxanne's first interview with Mason, she relayed the events beginning with when she awoke to dense smoke and how her dog, who was in the same room with her at the time, did not survive the fire.

At the second interview, Michael Boyer relayed his recollection of the events preceding the fire and what transpired after he realized there was a fire. When asked by Mason whether either of his children were possible smokers, Michael stated that Roxanne was the only smoker. At her second interview with Mason, Roxanne relayed her recollection of events prior to the fire and she did not believe she had a cigarette early that morning but conceded she may have done so out of habit. Roxanne stated that the only ashtray in the craft room was located on a sewing table along the south wall of the house.

Mason also interviewed Allan Clay Township Fire Chief Bruce Moritz and conducted a telephone interview of Diana Styles, the passerby who made the 911 call to report the fire. Mason's investigation also included laboratory analysis of samples taken from the craft room, and photographs conducted during the investigation. Mason's report also noted a request from Michael Boyer regarding examination of the breaker box. Mason's conclusion, submitted in his report dated April 28, 2011, determined the north wall of the craft room to be the room of origin. (Doc. No. 42-1 at p. 155). He also eliminated all accidental sources and determined the fire to be incendiary in nature. (*Id.*)

Sadler & Associates submitted a supplemental report by its electrical engineer, Allan Topor, on May 6, 2011. His purpose was to ascertain the causal relationship between the home's electrical system and the fire. Topor's investigation included an on-site visit on April 8th. The laboratory investigation included examination of items taken from the second floor. It was Topor's conclusion that "[o]f the equipment examined at the scene and in the laboratory, it is our opinion that the fire was not electrical in nature." (*Id.* at p. 160).

After receipt of the report from Sadler & Associates, Allstate's claim representative, Victoria Hoenigman, continued the investigation to determine if the claim was a covered loss under the terms of the policy. Part of Hoenigman's investigation included recorded statements from Michael and Roxanne Boyer on May 26, 2011.

At those interviews and in response to a question about any problems with any mechanical or electrical systems prior to the fire, Michael Boyer answered, "Hm . . . Not that I noticed." (Doc. No. 42-1, p. 45).

As part of Allstate's investigation and pursuant to the terms of the policy, the Defendant conducted examinations under oath with Michael, Roxanne, Matthew, and Amanda Boyer in June 2011. During Michael's examination, he was asked about problems with the home's electrical systems, the heating system and overall working condition of the house, he indicated there were none.

At her examination, Roxanne Boyer was asked about the status of her marriage:

Q: Have you ever consulted with an attorney or anyone about a divorce?

A: No.

(Doc. No. 43-2, p. 277).

Q: Prior to - - let's say in the six months prior to the fire, were you and Michael getting along fine?

A: Yes.

Q: No problems in your relationship?

A: Nothing any marriage wouldn't deal with.

Q: Okay. That describes a lot in your answer.

A: Okay. We had not been fighting. I mean, we may have like a little disagreement over the time of day that it is, but nothing major.

Q: Okay. No plans by either of you to move out of the house?

A: No.

Q: And you think he perceives your relationship the same way, maybe a little squabble here and there but nothing major was going on?

A: Yes. But off the record, you know, the wife is always right anyhow.

(*Id.* at p. 396).

At Matthew Boyer's examination, he was asked if he smoked and he answered, "No." (*Id.* at p. 167).

A few months later, Hoenigman learned that Roxanne Boyer was divorcing Michael and had requested a restraining order against him. Subsequently, Hoenigman learned Michael Boyer had been indicted on aggravated arson for the April 11, 2011 fire.

In December 2011, Roxanne Boyer's examination was continued during which she was questioned about her relationship with her husband. Roxanne conceded she and Michael had disagreements as he thought she was having an affair based on pop-up advertisements he saw on her Facebook page. (Doc. No. 42-1, pp. 168-171).

Via a letter dated January 16, 2012, Allstate notified the Boyers their claim was denied.

**C. The Criminal Trial**

Michael Boyer was tried for arson in the Ottawa County Court of Common Pleas in October 2012. At the trial, Matthew Boyer testified there was talk of divorce between his parents around the time of the fire. Matthew also stated that at the time of the fire he [Matthew] smoked, "a little bit, but not regularly." (*Id.* at p. 174).

During Roxanne Boyer's testimony, she testified she was unhappy in her marriage at the time of the fire and that Michael suspected her of having an affair. (Doc. No. 45-2, pp. 138-147). Roxanne also stated there was talk of divorce between her and Michael at least a month before the fire. (*Id.* at p. 149). Prior to the fire, she testified that Michael kept track of her activities to ensure she was not being unfaithful. Examples of this included following her to work, Roxanne showing him her time sheets, Michael going through her purse and cell phone, putting a key logger on her computer, and installing hidden video cameras throughout the house. (*Id.* pp. 144-146).

On the day of the fire, Roxanne had an appointment to see an attorney about a divorce but did not go because of the chaos surrounding the fire. After the fire, Roxanne, Michael, Matthew, and Amanda Boyer moved into Michael's mother's apartment for a month before renting another house. (*Id.* at p. 170).

Michael Boyer was ultimately acquitted of all charges against him.

**D. Allstate's Determination Process**

Victoria Hoenigman, Allstate's representative, testified she was assigned to the claim approximately five to ten days after the fire. (Doc. No. 76-1, p. 9). She also confirmed in being given the assignment, she was told "the fire had been determined to be an account of arson." (*Id.* at p. 46). Hoenigman acknowledged being aware the Fire Marshal accused Michael Boyer of starting the fire. (*Id.* at p. 16). She also confirmed the reasons for denying the claim included material misrepresentations, an intentional act committed by an insured, and a financial motive. (*Id.* at p. 15).

Hoenigman stated her investigation included a background check, including criminal activity, for all of the insureds. When asked why that was done, she stated, " There were only four people in the house the morning of the fire, they were all insured people and it was an arson. So, at that point all four of them are suspect." (*Id.* at p. 19).

Hoenigman conceded that Matthew Boyer's characterization of his parent's marriage (in his interview with Eric Mason) was consistent with the answers given by Roxanne and Michael. (*Id.* at p. 25). Hoenigman then conducted recorded statements of Roxanne and Michael in late May, followed by examinations under oath in June.

According to Hoenigman, the material misrepresentations were "made in the examinations in June." (*Id.* at p. 29). Allstate bases this on the fact that Roxanne filed for divorce and that Michael was arrested after the examinations under oath. (*Id.*) Hoenigman stated the decision to deny the Plaintiffs' claim was made after Roxanne's continued examination under oath in December 2011. (*Id.* at p. 53).

Allstate's determination, according to Hoenigman, was based on the following: "[I]'s a matter of what the evidence in the file showed and it showed that an insured person was responsible for the fire; therefore, there's no coverage under the contract." (*Id.* at p. 34). Hoenigman and an analyst with Allstate made the ultimate determination to deny the claim. (*Id.* at p. 8).

## III. Summary Judgment Standard

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is

genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV. DISCUSSION

### A. Positions of the Parties

Defendant moves for summary judgment on the basis of material misrepresentations by the insureds Michael and Roxanne Boyer on the state of their marriage. The Defendant also contends Michael Boyer misrepresented the condition of the home's electrical system. They further submit that Matthew Boyer also lied about his smoking. As the Defendants contend they are entitled to summary judgment on the basis of material misrepresentations by the insureds, they seek summary judgment on the bad faith claim.

### B. The Policy

Neither side disputes the pertinent portions of the policy applicable to this dispute:

> **DEFINITIONS USED IN THIS POLICY**
>
> 1. **"You" or "your"**—means the person named on the Policy Declarations as the insured and that person's resident spouse.
>
> 3 **"Insured person(s)"**—means **you** and, if a resident of **your** household:
>
> a) any relative; and
>
> b) Any dependent person in **your** care.

(Doc. No. 42-1, p. 78).

> **CONCEALMENT OR FRAUD**
>
> This policy is void if it was obtained by misrepresentation, fraud or concealment of material facts. If it is determined that this policy is void, all premiums paid will be returned to **you** since there has been no coverage under this policy.
>
> **We** do not cover any loss or **occurrence** in which any **insured person** has concealed or misrepresented any material fact or circumstance.

(*Id.*, p. 81).

> **LOSSES WE COVER UNDER COVERAGES A AND B:**
>
> **We** will cover sudden and accidental direct physical loss to property described in **Coverage A—Dwelling Protection** and **Coverage B—Other Structures Protection** except as limited or excluded in this policy.
>
> **LOSSES WE DO NOT COVER UNDER COVERAGES A AND B:**
>
> **We** do not cover loss to the property described in **Coverage A—Dwelling Protection** or **Coverage B—Other Structures Protection** consisting of or caused by:
>
> . . . .
>
> 9. Intentional or criminal acts of or at the direction of any **insured person**, if the loss that occurs:
>
>    a) may be reasonably be expected to result from such acts: or
>    b) is the intended result of such acts.
>
> This exclusion applies regardless of whether or not the **insured person** is actually charged with, or convicted of a crime.

(*Id.* at p. 82).

With the relevant portions of the policy set forth, I now turn to the specific arguments of the parties.

**C. Material Misrepresentation**

In Ohio, "[a] misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 537 (6th Cir. 2014). (Citations omitted). "The subject

of the misrepresentation 'need not ultimately prove to be significant to the disposition of the claim, so long as it was reasonably relevant to the insurer's investigation at the time.'" *McCurdy v. Hanover fire & Cas. Ins. Co.*, 964 F.Supp.2d 863, 870 (N.D. Ohio 2013), citing *Abon, Ltd. v. Transcon. Ins. Co.*, 2005 WL 1414486 at *13. It is generally accepted that "[t]he materiality of a misrepresentation is a mixed question of law and fact that under most circumstances should be determined by the trier of fact." *Id.*

In addition, "(a) defense based on an exception or exclusion in an insurance policy is an affirmative one, and the burden is cast on the insurer to establish it." *Continental Ins. Co. v. Louis Marx Co., Inc.*, 64 Ohio St.2d 399, 401 (1980) (citation omitted).

In this instance, the Defendant's Claims History Report reflects that as early as April 14, 2011, Allstate was aware the fire was considered incendiary in nature. (Doc. No. 70-1 at p. 2). By the end of April 2011, Eric Mason's report came to the same conclusion and it was followed up by the electrical engineer's supplemental report on May 6, 2011, that the fire was not electrical in nature. Of particular significance in the Claims History Report are notes from the Home Office Referral:

> O&C – Eric Mason of Sadler & Associates has stated he is calling the fire incendiary in nature – having originated at the floor level in a second floor craft room in and around a box of nursing books and a box of the childrens [sic] art work and other momentos [sic]. O&C secured two samples and shipped them to the lab for analysis – verbal on the same is not available as yet.
>
> State of Ohio Fire Marshal Office- has advised they have also called fire incendiary in nature, they have an open and active investigation and are not releasing anything further at this time.
>
> Other observations to date – based on the timeline that was put together by the O&C after speaking separately to Mr. & Mrs. Boyer and the household activities in the morning of the fire – it appears likely at this point that an insured person intentionally set this fire.

(*Id.*) Based upon Allstate's own referral reports, arson by one of the insureds was targeted as a cause from the outset of the investigation.

The question then becomes whether Michael, Roxanne, and Matthew Boyer made misrepresentations of any material fact or circumstance during the investigation which justified Allstate's denial of their claim.

While materiality is a mixed question of law and fact, the trial court in *Albon* noted, "materiality 'can be decided as a matter of law if reasonable minds could not differ on the question.'"

The questions posed to Matthew Boyer by Eric Mason regarding smoking were straightforward but lacking in precision to ferret out an accurate answer. At the criminal trial, Mason testified that he was skeptical of Matthew's answers and searched for cigarette butts in places where a teenager might hide them such as windowsills but found nothing. (Doc. No. 45-2 at p. 158).

Michael Boyer's answers regarding the home's electrical system must also be considered in light of his request to Eric Mason on April 25, 2011. On that day, Mason reported being contacted by Michael and "asked this investigator if the branch circuit panel board located in the basement was examined, and that there were some 'messed up circuits in there, that were supposed to have been fixed and never were.'" (Doc. No. 42-1, at p. 154). Allstate had this information as it was noted in Mason's report prior to the recorded statement or examinations under oath. There was no mention of Michael Boyer's request by the Sadler's electrical engineer in his supplemental report of May 6th where he ruled out the electrical systems as the course of the fire.

Roxanne's answers at her initial examination under oath regarding the state of her marriage do not rise to clear misrepresentations as a matter of law. At her deposition, Roxanne explained

she stayed with Michael (after the fire), moving with him to his mother's home and that she was working on her marriage prior to the fire. (Doc. No. 44-1, p. 85-86). "[M]ost courts have construed materiality broadly," *Albon*, *supra,* and that materiality is judged at the time of the answer. *See* 13 Couch on Insurance § 197:16 (3d ed. 2014). Based upon the answers given at her initial examination under oath, I find reasonable minds could differ on whether Roxanne's answers were material misrepresentations.

Early in Allstate's investigation, they determined the fire to be incendiary in nature and to have been intentionally set by an insured. Hoenigman conceded she did not think Roxanne started the fire but Allstate's focus was on Michael as the culprit. A "false sworn answer [is] material if it 'may be said to have been calculated either to discourage, mislead or defect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate.'" *Albon, Ltd v. Transcontinental Ins. Co.*, 2005 WL 1414486 *13 (Ohio Ct. App. 2005), *citing*, *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 182-84 (2d Cir. 1984). Based upon the record before me as highlighted above, I find there are issues for the trier of fact regarding the alleged intentional misrepresentations of material fact relied upon by the Defendant to deny the claim. *See Peterangelo v. State Farm Fire & Cas. Co.* 2014 WL 1576907 *8 (S.D. Ohio 2014). Therefore, the Defendant's motion for summary judgment is denied on this branch of its motion.

**D. Bad Faith**

Allstate also seeks summary judgment on the claim of bad faith. The Defendant's position presumes it prevails on the breach of contract claim based upon a material misrepresentation.

In *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (1983), the Court held that "based upon the relationship between the insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action against the insurer."

The Sixth Circuit has addressed the legal standard to be considered for a breach of the duty of good faith in Ohio as follows:

> An insurer fails to exercise good faith when it refuses to pay a claim without "reasonable justification." *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397, 399-400 (1994) (holding that actual intent is not an element of the tort of bad faith); *see also Corbo Props., Ltd. v. Seneca Ins. Co.*, 771 F.Supp.2d 877, 880 (N.D. Ohio 2011). Denial of a claim may be reasonably justified when "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that give rise to the claim." *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 605 N.E.2d 936, 943 (1992).

*Retalil Ventures, Inc. v. National Union Fire Ins. Co.*, 691 F.3d 821, 834 (6th Cir. 2012). The Court reiterated the Supreme Court of Ohio's holding that the "'[m]ere refusal to pay insurance is not, in itself, conclusive of bad faith.'" *Id. citing Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d at 277 (1983).

In this case, Hoenigman testified Allstate based its decision to deny the claim in part as follows:

Q: And again, your conclusion about his [Mr. Boyer's] actions is based upon the cause and origin reports and –

A: The evidence in the file.

Q: Ok. Did anybody ever tell you that they saw Mr. Boyer set the fire?

A: No, ma'am.

Q: And was there any evidence of any kind of accelerant in that room?

A: There were pour patterns in that room, yes, ma'am.

Q: Pour patters?

A: Yes, ma'am.

Q: What do you mean by pour patterns?

A: Where a liquid has been poured or placed to help a fire grow.

Q: And who, observed these pour patterns?

A: Mr. Mason.

Q: And that is included in his report?

A: Yes, ma'am.

Q: What had been poured to your, did he make, drew any conclusions about what, if anything, were was poured?

A: We weren't specifically able to identify what type of liquid was poured. The lab samples came back negative for petroleum distillates or medium petroleum distillates. They did get hits for vegetable oil or a vegetable based product.

Q: And did his report also conclude that vegetable based products are often used in coatings for wood floors?

A: Yes.

Q: And is that consistent with your understanding and experience?

A: Yes.

Q: So, you didn't believe that vegetable oil was a cause of this fire, did you?

A: No.

Q: Was your decision to deny coverage based in part on what you believe was evidence of pour patterns on the floor?

A: In, just all of the evidence together along with an incendiary cause and the information that we had regarding motive and the material misrepresentations made in the claim by the insured persons led to the denial of the claim.

(Doc. No. 76-1, pp. 66-68).

The Sadler report addresses the room of origin in pertinent part:

> In the center of the room were two burn patterns on the hard wood floor. Prior to my arrival someone had removed some of the wood flooring from these areas. Which I later discovered was done by the state fire marshals [sic] office. This investigator took samples from both of these burned areas of the floor. (See attached lab report). Near these floor patterns were heat shadowing witness marks caused by placement of boxes. . .

(Doc. No. 42-1, p. 148).

The report then addressed the lab results from the flooring samples taken from the room of origin:

> These samples consisted of charred sections of wooden flooring material. Utilizing gas chromatography/mass spectrometry both samples tested negative for ignitable liquids. Both samples did test positive for unsaturated vegetable oils. Prior to testing I was informed by Dick Hedglin, of Great Lakes Analytical, that due to the hardwood floor having a stain and finish, the samples would likely test positive for vegetable type oils. He informed me that many stains and finishes contain oils of this type. Therefore the results are inconclusive. (Great Lakes Laboratory report is included as an Appendices of this report.)

(*Id.* at pp. 153-54).

After considering the statements of the insureds, lab analysis, on-site inspections, photographs and requests, Mason's report included the following analysis:

> According to the statements made by all of the occupants of the residence, they never burn candles unattended, and there were no candles burning the morning of the fire. The only smoker in the home is Mrs. Boyer who was asleep at the time of the fire. She stated that there was one ashtray in the room of origin on a sewing table near the South wall. The last time she had been through the room of origin was at approximately 4:00 a.m., on her way to the restroom. She stated that she does not believe she had a cigarette at that time, but cannot be sure. With the fire being discovered at approximately 7:20 a.m. by Mrs. Boyer, discarded smoking materials would have had to smolder for approximately 3 hours and 20 minutes. A cigarette smoldering for this amount of time in combustible materials would produce a noticeable amount of smoke prior to raising the combustible materials to their ignition temperature. Amanda Boyer was in the craft room three separate times the morning of the fire, the last time being around 7:05 am, and did not smell, or see the presence of smoke. Mr. Boyer also entered the room the morning of the fire at approximately 6:15 am, and witnesses no evidence of smoke. Utilizing their witness statements this investigator was able to rule out the possibilities of, smoking, lit candles, and spontaneous combustion as causes for this fire.

(*Id.* at pp. 154-55).

Allstate's reliance on the Sadler report regarding the detected burn patterns support the finding that the fire was deemed incendiary, but are inconclusive for use of an accelerant as noted in the lab results. There is no dispute that Roxanne and Michael Boyer cooperated with Allstate and provided documents when requested by the insurer.

As previously discussed, the material misrepresentations upon which Allstate relies upon are not as clear-cut as presented and are for the jury to assess on the issue of materiality. *Compare Smith v. Allstate Ins. Co.*, 2006 WL 3833533 (S.D. Ohio 2006) (granting the insurer summary judgment on bad faith claim citing 18 instances of blatant misrepresentations and concealment of material facts as well as the non-cooperation of the insureds in failing to provide documentation upon request by the insurer), *aff'd* 304 Fed. Appx. 430 (2008).

The motive to which Allstate bases its denial, in part, was a financial motive as Hoenigman testified she believed there was "financial pressure" on the insureds. (Doc. No. 76-1 at p. 13). She later testified that in investigating the Boyer's finances, "they were getting by," but "if you tip the balance by removing an income you would not be able to keep up with all of it." (*Id.* at pp. 71-72). The other part of the motive upon which Allstate relied upon went to the state of the insured's marriage:

> The motive was he was either going to scare her, he was attempting to scare her or kill her was the prime motive. This could be a financial motive in there with it, if she were to leave he is on social security disability, he has numerous rental properties that were not bringing in any rent and he had delinquent property taxes on many of those properties as well that were on a repayment program.

(*Id.* at p. 71).

Given the circumstances in this case, I cannot find that Allstate's refusal to pay was without reasonable justification as a matter of law. Accordingly, the Defendant is entitled to summary judgment on the claim of bad faith.

## V. Conclusion

Based upon the foregoing, the Defendant's motion for summary judgment is granted on the claim of bad faith but denied on the issue of intentional misrepresentation of a material fact.

A telephonic status conference is scheduled for September 8, 2015 at 2:30pm. The Court will initiate the phone call.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge